Whitaker, Judge,
delivered the opinion of the court:
This is a suit for just compensation for the alleged taking of plaintiff’s property resulting from the flight of heavy airplanes over its land.
In February 1951 McIntosh & Company, Inc., purchased a 7514-acre tract of land about a mile east of Hunter Field, an airport on the outskirts of Savannah, Georgia, for the purpose of subdividing it for residential use. In December 1951 McIntosh & Company organized plaintiff corporation, to which it deeded the property in February 1952.
In 1950 the United States acquired Hunter Field from the City of Savannah for use as a military airfield. Before that it had been used as a municipal airport. There were three runways on it, one running northeast-southwest, another northwest-southeast, each about 5,000 feet in length, and a third, running roughly east and west, and somewhat shorter than the other two. Between 1947 and 1949 the northeast-southwest runway was extended 2,000 feet, making it 7,000 feet long. This runway was used almost exclusively by the heavier planes. The east-west runway, only about 5,000 feet long, was used by heavy planes only in exceptional circumstances, when there were unusually high winds.
In February 1952, the defendant completed a new east-west runway, 10,500 feet in length. Its eastern end was 5,500 feet from plaintiff’s property. In May 1952, the use of the other runways was discontinued and all flights from then on used only the new east-west runway. The center of this runway, if extended, would run along the northern boundary of plaintiff’s property, with the result that from 85 to 90 percent of plaintiff’s property lies within the eastern approach zone to this runway, as plotted by the defendant.
Prior to December 31, 1953, propeller driven airplanes, using the east-west runway, passed over plaintiff’s property at altitudes from 200 to 1,200 feet and higher. However, these flights did not seriously interfere with plaintiff’s use and enjoyment of its property. However, on December 31, 1953, the first of some 90 six-engine B-47 Stratojet Bombers arrived, and others followed at a rate of approximately 15 a month, replacing the propeller driven planes, formerly using the airfield. These jet bombers flew over plain *271 tiff’s property at a lower altitude than the propeller driven planes had.[1] They made a greater and more piercing noise, and caused much greater vibration than the propeller driven planes had. They flew over plaintiff’s property at the rate of from 30 to 60 a day. • When they passed over the property, all conversation had to cease, radio and television reception was disrupted, the windows in the houses shook, dishes rattled on the shelves, sleep was disrupted, and the noise was so great as to be painful to the ears of some of the residents. Some were in a constant state of anxiety, and even had to undergo medical care for nervous disorders, said to have been induced by anxiety over the passage over their homes of these jets.
McIntosh & Company had purchased the property in order to subdivide it into building lots for sale as medium cost homesites. The property, known as Highland Park, was divided in the middle by a county drainage canal.[2] The property to the east of this canal had been developed by the construction of streets and sewers, gas, water, and electric lines. In the eastern half there were 76 lots.
From July 1952 until April 1955 plaintiff disposed of 48 of the 76 lots in the eastern half. On these 48 lots sold, 43 houses were constructed. Of the 48 lots sold, 15 were sold in 1952, 25 in 1953, 6 in 1954, and 2 in 1955. No lots have been sold since April 1955, and no houses have been constructed since that time.
Subsequent to April 1955 no private lending institution in the Savannah area was willing to finance the sale of any property or the construction of a home in the Highland Park subdivision. One real estate mortgage correspondent, who had made 37 out of a total of 41 mortgage loans on the Highland Park property, refused in the spring of 1954 to make any further loans in the subdivision, and in April 1955 the Veterans Administration refused to make an appraisal of property in the subdivision, as a preliminary to guaran *272 teeing a loan on it, because “the property lies too close to the runway zone of Hunter Air Force Base.” The Veterans Administration Technical Bulletin, TB-4A-121, forbade appraisals of property within a runway zone, and gave “special consideration” to property within an approach zone.
In April 1951 McIntosh & Company gave to the local Board of Education a five-acre plot in the eastern half of Highland Park, conditioned on the building of a grammar school thereon. In January 1952 the commanding officer at Hunter Field asked the county authorities to construct an access road to the school from Hunter Field. However, on May 20, 1952, even before the advent of the B-47 S trato jet Bombers, the commanding officer of Hunter Field wrote the Board of Education as follows:
Respectfully, your attention is invited to the new East-West runway system in operation at this Base. I feel that the construction of a school near the approach zone of a runway undesirable. The two sites, as located on the inclosed map, are near the take-off and approach zone to this runway system.
Since present and future aircraft flying from this runway system will produce noises of variable intensity, we feel the noise level will be an impediment to classroom instruction and recitation. The normal operation of aircraft does not present a danger, however, it is recognized that an emergency can and may develop which could become hazardous.
Thereafter, this property was returned to McIntosh & Company by the Board of Education, and by it deeded to the plaintiff.
Defendant, of course, does not deny that it has taken an easement in the air space over plaintiff’s property, and it must be concluded from the foregoing that the passage of these planes over plaintiff’s property seriously impaired its value for residential purposes.
It follows, therefore, under the holding of this court in Causby v. United States, 104 C. Cls. 342, 109 C. Cls. 768, and the holding of the Supreme Court in United States v. Causby, 328 U. S. 256, that the defendant is liable for just compensation for the taking of the easement, and the resulting damage to the remainder of the property.
*273 The first question is the date of the taking of an easement. Of course, if defendant had already taken an easement before plaintiff acquired the property, plaintiff would not be entitled to recover. Defendant says an easement was taken immediately after its acquisition of Hunter Field and when its planes began to fly over it, which was before plaintiff acquired the property. We do not think this is so.
As the Supreme Court said in Causby v. United States, supra, the air space over the land is a part of the public domain, which may be used by airplanes with impunity so long as the flights do not substantially interfere with the use and enjoyment of the surface of the ground. The proof here shows that flights of propeller driven planes over plaintiff’s property did not substantially interfere with the use and enjoyment thereof. While these planes were flying over the property plaintiff sold 40 out of 76 lots in the eastern half of the subdivision. It was not until the arrival of the jet bombers, beginning on December 31, 1953, that plaintiff’s use and enjoyment of its property was seriously interfered with.[3] After that time plaintiff was able to sell only 8 lots; 6 in 1954, and 2 in 1955. We think the taking occurred when the first jet bomber flew over plaintiff’s property, with the intent on the part of the defendant to continue to fly them over it at will. Portsmouth Co. v. United States, 260 U. S. 327; Gerlach Live Stock Co. v. United States, 111 C. Cls. 1, 86; aff. 339 U. S. 725. The findings show that the defendant intended to base 90 B-47 Stratojet Bombers at this base, and to fly them over plaintiff’s property constantly. We think the taking occurred on December 31, 1953.
The difficult question in the case is what is just compensation. McIntosh & Company purchased the land in February 1951 for $35,000. They conveyed it to plaintiff, which was organized by McIntosh & Company in order to handle the sale of the lots, in February 1952, for $38,500, the increase of $3,500 representing the engineering and surveying costs expended by McIntosh to the date of the transfer to plaintiff.
*274 As stated above, the property was divided in two by a county drainage canal. There were 76 lots in the fully developed eastern half, of which plaintiff had sold 48, leaving 28 lots unsold. The part of the property to the west of the drainage ditch was wholly undeveloped, but plaintiff had platted it into 108 lots, but had not staked these out in the ground.
The trial commissioner has found that the 136 unsold lots, both in the eastern and western halves, would have had a value on December 31, 1953, of $20.00 a front foot, except for the passage over them of these jet bombers. There were 11,801 front feet in the 136 lots. At $20.00 a front foot, he finds a total value of $236,000 as of December 31,1953. From this amount he deducts $60,000 as the estimated cost of constructing roads and other facilities in the western half, and finds a value as of December 31, 1953, of $176,000. He also finds that they have a value of $20,600 under the actual conditions existing, that is, with the jet bombers flying over them.
However, he concludes in his opinion that the date of the taking was April 12,1955, and that the lots should be valued as of that date. He finds that on that date the lots would have had a value of $22.50 a front foot, in the absence of aircraft flights, or a net total of $205,522.50. On this'basis he finds that the net value of the property taken, after deducting a residual value of $20,600, is $184,922.50 as of April 12,1955.
This residual value of the property of $20,600, he finds, is the amount a speculator might pay for it, on the theory that the Government might abandon the use of Hunter Field as a jet bomber base. So long as it is used as a jet bomber base, the plaintiff’s property has no value at all for residential purposes.
It cannot be denied that the value of the lots for the use plaintiff contemplated to make of them has been destroyed. Plaintiff sold the 48 lots in the eastern half with certain restrictive covenants, which no doubt makes it impossible for it to sell the remaining lots for other than residential purposes and, on the basis of the proof, we agree with the trial *275 commissioner tbat they had a residual value of no more than $20,600.
So far as the 28 lots on the eastern half are concerned, plaintiff’s appraisers appraised them at $20.00 a front foot and above. Defendant’s appraisers appraised them, one at about $14.84 a front foot, and another at about $21.35 a front foot. We think a valuation of $20.00 a front foot is proper. These 28 lots had a total front footage of 2,426 feet. At $20.00 a front foot, this gives a total of $48,520.
However, the projected lots in the western half of the property cannot be valued on the same basis as the unsold lots in the eastern half. The western half, as stated, was wholly undeveloped. It was in its original wild state, with trees, laden with vines and Spanish moss, standing on it, and covered with underbrush. It had not been drained, and it was not then known whether or not it could be drained sufficiently for the construction of septic tanks on it, which was the only means of taking care of sewage.. It was in the same state it was in when McIntosh & Company purchased it.
It was not accessible from the eastern half. It was cut off therefrom by a drainage canal. It was accessible only from White Bluff Road on the west, and through unpaved dirt streets running through Avalon, a low cost, unrestricted development immediately adjoining it on the west.
When plaintiff purchased it, it no doubt thought it could develop this western half and sell lots therein for approximately the same price as the eastern half. Yet, it must be remembered that the former owners of the property had been willing to sell both the eastern and western halves for $85,000. The acreage in the western half was considerably more than one-half of the total acreage. There were 76 lots in the eastern half, and 108 projected lots in the western half. The front footage of the lots in the eastern half was 2426; and 9,375 in the western half. Plaintiff paid for the western half more than one-half of the purchase price of $38,500. On the basis of the acreage in the two halves, plaintiff paid approximately $24,500 for the western half. Allowing plaintiff a profit of 50. percent for this western half, it would be entitled to recover for the taking of it the amount of $36,750. We have said it was entitled to recover for the eastern half *276 $48,520, making a total of $85,270. From this there is to be deducted, however, the residual value, referred to above, of $20,600, leaving a net amount of $64,570.
We think a judgment for $65,000 represents just compensation. Judgment for this amount will be entered, together with interest thereon, as part of just compensation, at the rate of 4 percent per annum from December 31, 1953 to date of payment.
Defendant is vested with a perpetual easement of flight over plaintiff’s property at an elevation of 100 feet or more above the ground, with airplanes of any character.
It is so ordered.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Highland Park, Inc., a Georgia corporation, is the owner of property known as the Highland Park Subdivision (hereinafter referred to as Highland Park), a restricted homesite development in Chatham County, Georgia, 1% miles south of the Savannah city limits. Hunter Air Force Base (hereinafter referred to as Hunter Field) is a Strategic Air Command installation lying due west of Highland Park.
hunter field
2. Origin. — Hunter Field is located on the former site of the Savannah Municipal Airport which was first established by the city in 1928 and placed in operation in 1931 as a commercial airport after the city had acquired land for the flying field, constructed runways, and entered into a lease with a commercial airline for the use of the airport. In March 1941 the city leased the airport to the United States for military and defense purposes, and later that year acquired additional land to expand the airport which was added to the lease. The United States developed it into a military air base for use during World War II, constructing numerous barracks, hangars, storage and supply build *277 ings, railroad facilities, and new runways. During the lease period commercial flight activities serving Savannah were diverted to the Travis Municipal Airport on the outskirts of Savannah.
3. Early runway 'patterns. — Prior to 1940 the airport had three asphalt runways, two of them running northeast-southwest and northwest-southeast about 5,000 feet each in length, and the third running roughly east-west and being somewhat shorter. In 1940-41 the United States constructed three new concrete runways each 5,000 feet in length paralleling and somewhat south of the previous asphalt runways, the east-west runway being about 1,800 feet south of the one it replaced. The older runways were thereafter used as interconnecting taxiways.
4. Early uses. — Prior to being occupied by the United States as a military airport in World War II, the field was used exclusively by commercial scheduled aircraft and private aircraft, and by a flying school, all aircraft then being of the prevailing propeller-driven types. During World War II it was used exclusively by the Army Air Force as a military training center for air combat activities, and was then known as the Savannah Army Air Base and sometimes as Hunter Army Air Field. The Eighth Air Force was activated there in early 1942 and during the war the airport was used also as a staging area for ferrying B-17 and B-24 four-engine bombers to overseas combat zones. All types of military aircraft were stationed at and operated from the field in large numbers during the war period, ranging from single-engine fighter and reconnaissance planes to four-engine cargo planes and two- and four-engine light, medium, and heavy bombers. All of the planes during this period were propeller-driven. Since aircraft ordinarily land and take off into the wind, and weather records indicate that the prevailing winds at Hunter Field are approximately from the west and east, a substantial proportion of aircraft departures and landings at Hunter Field during the war period were from and to the east-west runway constructed in 1940-41. The projected center line of this runway ran eastwards along the northern boundary of the property now known as Highland Park, so that the greater portion of that property *278 was within the eastern approach zone (i. e., area flanking the eastwardly projected center line of the runway) of the east-west runway constructed in 1940-41. Thus, depending on the type of aircraft, as well as weather conditions and other operational factors, during the war period propeller-driven military aircraft frequently flew over the property now known as Highland Park at altitudes not disclosed by the record.
5. Postwar history and uses.- — Hunter Field was deactivated as a military air base and returned to the city of Savannah in September 1946. Thereafter, until September 1950, Travis Field (styled Chatham Field by the Air Force) became the military air base in the Savannah area, and Hunter Field was operated again as a municipal airport. As such it averaged over 200 landings and take-offs daily of commercial transport planes, privately owned civilian aircraft, and some military aircraft. During the period of approximately four years between September 1946 and October 1950, all air traffic into and out of the airport, both commercial and military, was directed and controlled from a control tower on the field which was manned 24 hours a day by employees of the Civil Aeronautics Authority. Three flying schools operated there. In March 1949 the Air National Guard leased a part of the use of the airport for training purposes, and during a two-week period in July 1950 the Air National Guard conducted training activities using F-80 single-engine jet fighter planes. These jet fighter planes used the northeast-southwest runway which had been extended 2,000 feet sometime between 1947 and 1949. Aircraft using the northeast-southwest and the northwest-southeast runways would not fly over the property now known as Highland Park while taking off and landing. Statistics compiled by the Department of Commerce from monthly reports of aircraft activity at airports supervised and controlled by the Civil Aeronautics Authority established that during the 43-month period from April 1947 through October 1950, there were approximately 340,000 take-offs and landings at the Savannah Municipal Airport, including commercial air carriers, military aircraft of the Navy and Air Force, and private civilian aircraft, or an average of *279 about 8,00.0 take-offs and landings a month. During the four-year period 1946 to 1950 it is not known which of the three runways was most frequently used. Prevailing winds would favor the east-west runway. The 2,000-foot extension made to the northeast-southwest runway between 1947 and 1949 would have made that runway preferable after its completion for certain uses, including jet fighter planes flown by the Air National Guard.
6. Reacquisition by United States. — Pursuant to negotiations earlier that year, in September 1950 the city of Savannah conveyed title to Hunter Field to the United States for use as a permanent military airfield. In exchange, the United States conveyed its title to Chatham Field (now Travis Field), which it had been theretofore using as a military airfield since leaving Hunter Field in 1946, to the city of Savannah for use as a municipal airport. In 1949 or 1950 Hunter Field was expanded and its eastern boundary moved to a point one-half mile closer in the direction of Highland Park. In October 1950, the United States established the Hunter Air Force Base at Hunter Field and transferred from Chatham Field to Hunter Field its activities and equipment, including many B-29’s and B-50’s (both four-engine, propeller-driven bombers), KB-29’s (B-29’s converted into tankers), and C-119’s and C-124’s (four-engine, propeller-type freight and cargo planes). These planes were used at Hunter Field until the arrival of six-engine B-47 jet bombers on December 31, 1953, as hereinafter related, and then phased out gradually.
7. Uses October 1950-May 195%. — During this period the types of aircraft described in the preceding finding flew on and off the three runways then in use, but most flights used the northeast-southwest runway which had been extended to 7,000 feet sometime during 1947-1949 because the planes were of such weight and size as to require the added distance. The 5,000-foot east-west runway was used during this period by the heavy planes only under exceptional circumstances when there were extraordinarily high winds. During this period planes of the type described in the preceding finding took off or landed over the property now known as Highland Park only on relatively infrequent occasions.
*280 8. 1950 zoning ordinances. — In September and November 1950 the city of Savannah and the county of Chatham, respectively, adopted and promulgated identical Airfield Zoning Ordinances regulating the height of structures and the use of property in the vicinity of Hunter Field and creating and establishing the zones in which the regulations and restrictions contained in the ordinances were to apply. Maps attached to the ordinances showed that the property now known as Highland Park lay substantially within the eastern approach zone to the east-west runway and was, accordingly, subject to the restrictions on uses and heights defined in the ordinances. Such restrictions did not, however, preclude the use of the Highland Park area for the residential uses to which it was later put by plaintiff, but were merely designed to put the public and the plaintiff on notice that Highland Park and other affected areas were within the restricted approach zones of the runways at Hunter Field. The ordinances, but not the maps attached thereto, were duly published in local newspapers.
On January 11, 1952, the Commissioners of Chatham County re-enacted the airfield zoning ordinance of November 1950, and attached to and made a part of the ordinance was a new zoning plan dated December 31, 1951, which showed that the greater part of the plaintiff’s property would be within the approach zone to the new 10,500-foot east-west runway.
HIGHLAND PARK
This section of the report will describe the inception and development of, and suspension of activities at Highland Park. Interspersed chronologically will be references to contemporaneous events at nearby Hunter Field relevant to the issues.
9. Planning stages— a. Highland Park, a 75%-acre tract of land, was purchased in February 1951 (deeded in April 1951) as undeveloped acreage by McIntosh & Company, Inc. (hereafter referred to as McIntosh), a Georgia corporation engaged in the construction business, for $35,000, for the purpose of creating a residential subdivision and building and selling homes and homesites through the Federal Housing Administration and Veterans Administration loan in *281 surance and guaranty programs. In February and March. 1951 McIntosh’s engineers conducted engineering surveys and topographical studies of the tract and prepared a tentative plan of the proposed subsdivision layout, submitting the same to the Federal Housing Administration for advice and suggestions. In late March 1951 the Federal Housing Administration suggested certain revisions to conform with their requirements for mortgage insurance commitments. Upon submission by McIntosh of revised plans the Federal Housing Administration, which had no authority to approve a development in its entirety, reported its willingness to consider mortgage insurance on applications pertaining to individual properties in the tract if certain enumerated requirements were met. In its letter of August 28,1951, to McIntosh accompanying its report Federal Housing Administration stated:
While this office has decided to cooperate with your Company in this development, we wish to call your attention to the fact that the effect of airplane flights over or near the subdivision would have an adverse affect on the marketability of the properties located in same. This adverse effect will vary depending on the location of any individual property in relation to the flights and also on account of the type and cost of the individual property. The price range given in the subdivision letter is from $10,000 to $15,000, and we suggest that the lower priced houses be located in the less favorable areas and the higher cost houses be located in the further areas.
While this office will do every everything possible to assist in a satisfactory development, it reserves the right to consider the valuation of individual properties, any reduction in marketability due to the conditions referred to above.
b. In the fall of 1951 the city, county, and State authorities concerned, who had been consulted frequently by McIntosh’s representatives earlier that year, approved a preliminary survey of the proposed subdivision submitted to them by McIntosh in September, reserving, however, their complete approval of the preliminary survey for the western half of the subdivision until State and county sanitary engineers inspected and approved that portion with refer *282 ence primarily to drainage and sewage disposal characteristics. The average elevation of Highland Park was 22-26 feet above sea level, well above the 8-foot minimum required in the area south of Savannah. The land was rolling and well drained. As is frequently the case in such subdivision developments, McIntosh planned to develop the entire tract in two phases, the eastern half first and then the western half. The western half is separated from the eastern half by a drainage canal.[4] It was never developed. It is still in its original wild state, with trees, laden with vines and Spanish moss, standing on it, and covered with underbrush. It was inaccessible from the eastern half on account of the drainage canal. It was accessible only through the low cost, unrestricted settlement of Avalon, over dirt roads. However, plaintiff had plotted 108 lots in the western half, but had not staked them out on the ground. The entire tract was suitable for the purposes in essential respects and was assessed and taxed on a lot basis by the county at all times subsequent to 1951.
10. Gift of school site. — Pursuant to an offer and an acceptance in April 1951 McIntosh conveyed gratis to the local Board of Education in December 1951 a 5-acre plot located in the eastern half of Highland Park, conditioned on the building of a grammar school to serve the area, including children of service personnel stationed at nearby Hunter Field. In January 1952 the commanding officer at Hunter Field asked the county authorities to construct or improve an access road to the school from Hunter Field.
11. New east-west runway. — In order to accommodate the larger, heavier, and more powerful types of military aircraft then in use at Hunter Field, and to avoid the dangers of a heavy traffic pattern over the city of Savannah then prevailing due to the predominance of flights from the northeast-southwest runway, the United States awarded a contract in May 1951 for the construction of a new 10,500-foot east-west runway. Those who designed the runway were not aware that it was being designed to accommodate jet *283 bombers. This runway, which, was south of the previous 5,000-foot east-west runway and almost parallelled its direction, was completed and in operation as early as February 1952, but was not placed in continuous operation until May 1952, after which all other runways at Hunter Field were closed down and the new east-west runway used exclusively for all landings and departures. The building of the new runway was available to public knowledge from its inception, since the invitation to bid which was publicly posted and widely distributed to various contractors specified its length, width and direction. But the exact position of the runway and its directional bearing over Highland Park were neither publicly advertised nor commonly known to those not engaged in its planning and construction. In November 1951 the defendant requested permission of the county authorities to trim the tops off of trees between the east-west runway and Highland Park where they projected above the minimum safe glide angle of aircraft landing on and departing from the east-west runway.
12. Organization of plaintiff corporation. — In December 1951 McIntosh organized the plaintiff as a corporate subsidiary to handle sales of Highland Park homes and lots, in order to keep land sales separate from the parent company’s construction activities. McIntosh owns 50 percent of the stock in plaintiff corporation and is the controlling stockholder. The balance of the stock is closely held by interests related to the development of Highland Park. In February 1952 McIntosh sold the property to plaintiff for $38,500, the increase of $3,500 over McIntosh’s original purchase price representing engineering and surveying costs expended by McIntosh to date.
13. Return of school site. — Because of the noise anticipated from aircraft operating over Highland Park from the newly completed east-west runway, the local Board of Public Education decided in May 1952 that the 5-acre plot in the eastern half of Highland Park which had been donated by McIntosh the preceding December was not a satisfactory location for a school and voted to deed the land back to McIntosh, which was then done. On May 20,1952, feeling that the noise and danger from aircraft operating from Hunter Field would *284 make Highland Park an undesirable location for a school, the commanding officer of Hunter Field wrote the Board of Public Education as follows:
Respectfully, your attention is invited to the new East-West runway system in operation at this Base. I feel that the construction of a school near the approach zone of a runway undesirable. The two sites, as located on the inclosed map, are near the take-off and approach zone to this runway system.
Since present and future aircraft flying from this runway system will produce noises of variable intensity, we feel the noise level will be an impediment to classroom instruction and recitation. The normal operation of aircraft does not present a danger, however, it is recognized that an emergency can and may develop which could become hazardous.
The 5-acre school site was deeded by McIntosh to plaintiff in September 1953 and subdivided into 14 lots for homesites. There is no evidence of any monetary consideration accompanying this transfer.
14. Final flan approval. — In June 1952 the appropriate local authorities approved the revised and final survey or plat for the eastern half of Highland Park. By the summer of 1952 the eastern half had been cleared and graded, streets had been paved, water mains and utilities installed, and a model house was constructed. In the meantime, the western half remained, and is now, undeveloped and in its natural state, except that center lines for streets were run and concrete markers installed in preparation for anticipated development which never materialized due to the circumstances complained of in this action. To clear the western half, grade, and pave streets, and provide other facilities comparable to the eastern half would take two or three months.
15. Restrictive covenants. — In July 1952 and September 1953 the plaintiff recorded declarations of restrictive covenants limiting the use of the lots in Highland Park to home-sites. Thereafter the plaintiff could not sell any lots in the development for purposes other than residential.
16. Sales of houses and lots. — Between July 1952 and the end of April 1955, the plaintiff sold and disposed of 48 of the 76 lots in the east half of Highland Park. During this period 43 houses were constructed and sold by McIntosh in *285 the east half and in those cases plaintiff sold the lots to McIntosh who conveyed the houses and lots to the purchasers. The remaining 5 lots were sold directly to the purchasers by the plaintiff. There were 12 houses plus 3 lots sold in 1952, 23 houses plus 2 lots in 1953, 6 houses in 1954, and 2 houses through April 1955. No lots or houses have since been sold by plaintiff.[5] The last house built at Highland Park was completed April 1955. Thus 136 lots at Highland Park remain unsold, 28 in the east half and 108 in the undeveloped west half. Sales of houses and lots in subdivisions in the Savannah area comparable to Highland Park, but not lying within the approach zones to Hunter Field runways, have remained active.
The total amount received from the sales of the houses and lots was in excess of $530,000, of which the plaintiff received between $50,000 and $60,000 for the land alone.
17. Flight activity May 195% through December 1953.— During this period there were thousands of flights of B-29’s, B-50’s, and other military aircraft such as KB-29’s, KC-97’s, and C-47’s, which passed over Highland Park in returning to or departing from the east-west runway at varying altitudes from 200 to 1,200 feet and higher. Flight activity during this period did not prevent the sale of homes and homesites at Highland Park.
18. Flight activity January 195J, et seg. — Hunter Field began receiving six-engine B-47 Stratojet Bombers on December 31, 1953, when two of a contemplated basic strength of 90 were assigned to the 2d Bomb Wing and the 308th Bomb Wing of the Strategic Air Command. Thereafter, B-47’s for the two bomb wings continued to arrive at the rate of approximately 15 a month and gradually replaced the B-29’s and B-50’s, which were completely phased out at this base by the end of 1954. In addition, squadrons of heavy four-engine propeller-driven KC-97 refueling tankers were assigned to each bomb wing. Neither plaintiff nor the public knew in advance of their actual arrival that Hunter Field was to be converted into a heavy jet bomber installation. During the two-year period commencing January 1954, the *286 number of landings and departures of B-47’s from or to the east end of the new east-west runway averaged somewhere between 900-1,000 a month, or slightly more than 30 a day (c. f., finding 21d, infra, which reports an acceleration in flight frequency in the summer of 1956. Whether there has been a steady acceleration, or whether there might be a seasonal fluctuation, is not ascertainable from the record).
19. Consequences at Highland Park.
a. Proximity to approach zone. — Approximately 85 percent or 90 percent of Highland Park lies within the southern half of the eastern approach zone to the east-west runway at Hunter Field, at distances ranging from 5,500 feet to 8,000 feet from the east end of the east-west runway, which was extended 875 feet on its west end in June 1955 giving it a total length of 11,375 feet. Because the B-47’s departing from and landing on the east end of the east-west runway did not adhere strictly to the projected center line of the runway, as theoretically they should have, but deviated southwards of it on the average (specifications in finding 21d), virtually all of Highland Park would be within the approach zone if the projected center line of the runway were to be relocated in a position corresponding to the actual route taken by arriving and departing B-47’s. A clear zone extends for 1,000 feet from the east end of the runway, at which point the approach zone starts. The approach zone is a symmetrical, funnel-shaped area (technically describing an isosceles trapezoid for that part embracing Highland Park) flaring out from the end of the clear zone with the projected center line of the runway as its axis.
b. Impact on residents. — Many residents of Highland Park testified as witnesses. They stated, collectively, that the noise created by B~47 jet bombers passing low over Highland Park en route to or from the east-west runway at Hunter Field made ordinary conversations difficult if not impossible directly beneath the line of flight, either indoors or outdoors. Telephone conversations were inaudible; radio and television reception was disrupted; windows shook; dishes rattled on shelves; sleep was disrupted; some ears pained; some residents were in a state of anxiety and under medical care for *287 nervous conditions; children were fearful although, curiously enough, children born at Highland Park apparently were acclimated to the conditions as being natural and so were not affected. Some residents testified that vibration generated by the B-47’s caused the appearance of masonry and plaster cracks in their homes, but it was not satisfactorily established that this could not have been the result of other causes. The quality and volume of the sound and vibration from B-47’s was noticeably different from and more pronounced than that caused by large propeller-driven planes, which some residents testified had caused them no concern. Home owners were unable, despite efforts, to sell their homes and move elsewhere without sacrificing their investments. Savannah canceled its plans to integrate Highland Park with the city sewage system because of the dubious extent of future use. While much of the foregoing testimony was subjective in nature, it was not refuted. It is easily concluded that the flight activities from Hunter Field since January 1951 have been incompatible with the use of Highland Park as a residential development and the record in the case offers no reason to anticipate an abatement of the nuisance.
c. Availability of mortgage money. — An experienced real estate mortgage correspondent, who was a vice president and a stockholder in plaintiff corporation, and who had made 37 out of a total of 41 mortgage loans on Highland Park property (six through Federal Housing Administration and 31 through Veterans Administration), refused in the spring of 1954 to make any more loans in the subdivision because he considered that the noise of the B-47 jet bombers leaving and arriving from the east-west runway directly over Highland Park would impair the collateral for loans there. Highland Park could not be successfully developed and sold without financing under the Veterans Administration loan guaranty and Federal Housing Administration mortgage insurance programs. On April 12, 1955, the Veterans Administration refused to make an appraisal of a property in Highland Park because “the property lies too close to the *288 runway zone of Hunter Air Force Base.” [6] Without an appraisal by the Veterans Administration a loan guaranty by them could not be obtained. The Federal Housing Administration, which issued its last mortgage insurance covering property in Highland Park in July 1952, would issue mortgage insurance only on application by a private lending institution approved by them willing to finance the sale. Subsequent to April 1955 no private lending institution in the Savannah area was willing to finance the sale of any property in Highland Park. For practical purposes, subsequent to April 1955 neither loans from private institutions nor the loan guaranty and insurance programs of the Veterans Administration and the Federal Housing Administration were available to plaintiff in connection with Highland Park sales because of the proximity of the property to the Hunter Field east-west runway approach zone.
SCIENTIFIC DATA
20. Noise measurements. — The average noise level of the Highland Park area under normal conditions (i. e., without aircraft overhead) is about 40 decibels. Zero decibels is taken as the threshold of human audibility at certain frequencies. The accepted threshold of feeling, or that point at which noise becomes physically painful to the ears, is about 120 decibels, again at certain frequencies. During a 27-hour sample period in December 1954, observers engaged by plaintiff, equipped with professional instruments to measure the sound intensity of aircraft passing eastwards over Highland Park after taking off from the east end of the east-west runway at Hunter Field, recorded separately the passage of 111 B-47 jet bombers and 61 propeller-driven aircraft of unrecorded types. The average sound intensity of the B-47’s was 76 decibels, the highest reading being 92 decibels. The average sound intensity of the propeller-driven aircraft was 60 decibels and the highest was 88 decibels. During a five-day sample period later the same month the same observers *289 under the same conditions measured the sound intensity of aircraft passing westwardly over Highland Park just before landing on the east end of the east-west runway at Hunter Field. They recorded separately the passage over Highland Park of 309 B-47’s and 323 propeller-driven aircraft of unrecorded types. The average sound intensity of the B-47’s was 10 decibels, the highest reading being 92 decibels. The average sound intensity of the propeller-driven aircraft was 53 decibels, the highest being 81 decibels. On taking off B-47’s augment their power to a maximum by injection of water in the fuel, which may account for the added noise recorded on take-offs. During certain times of the test periods aircraft passed over Highland Park at the average rate of every two minutes.
By means of plotting on a graph the data with respect to the elevation of and noise produced by each passing plane as recorded by plaintiff’s observers, it is apparent that there was no constant correlation between the height of the plane and the noise it produced at ground level. Whether this is because of atmospheric or topographic conditions, frequency variations, or other peculiarities of sound phenomena, is not adequately explained by the record. Because of its greater frequency, the noise generated by B-TTs is more noticeable to the human ear than that produced by large propeller-driven aircraft.
21. Procedures, elevations, course, frequency of flights.
a. Take-off procechwre. — B-lY’s taking off in an easterly direction from the east-west runway at Hunter Field take off under full power and, under normal conditions, are airborne by the time they have used 8,000 feet of the 11,375-foot runway. They then fly in a straight direction for 2% to 3 miles before making a turn.
. b. Minimum safe glide angle — The minimum safe glide angle prescribed by regulations for B-47’s leaving the east-west runway at Hunter Field in an easterly direction is an imaginary line commencing at the eastern end of the clear zone (a 1,000-foot zone free of obstructions beginning at the end of the runway) and rising eastwardly at a 50 to 1 ratio, i. e., 1 foot vertically for every 50 feet horizontally throughout the approach zone. No obstructions are permitted to *290 project above this imaginary line in the flight path. It is not to be confused with the normal path taken by B-47’s in taking off, which is considerably higher as well as confined directionally (with minor deviations) to the projected center line of the runway. The minimum glide angle crosses the western and eastern boundaries of Highland Park at about 100 feet and 150 feet above ground level, respectively.
c. Ground Control Approach (G. O. A.). — B-47’s landing from the east on the east-west runway under conditions of poor visibility are guided in by a Ground Control Approach system (G. C. A.) operated with radar. The flight path of aircraft landing under G. C. A. is an imaginary line crossing the eastern and western boundaries of Highland Park at elevations of about 400 feet and 275 feet above ground level, respectively.
d. Average elevations, course, and frequency. — Defendant conducted a 60-day test commencing July 17, 1956, to determine the actual elevations of B-47’s crossing over Highland Park en route from or to the east-west runway at Hunter Field. No distinction was made in the final results between elevations of planes taking off or landing. The average elevation of B-47’s passing over the western boundary of Highland Park during the test period was 325-375 feet above ground level. At the eastern boundary it was 425-475 feet above ground level. About 30 percent of the flights charted were lower than the average elevations given. It was also observed that the aircraft did not adhere strictly to the projected center line of the runway in crossing Highland Park as theory dictated, but deviated south of it by 200-300 feet at the western boundary of Highland Park and 325-425 feet at the eastern boundary. Data as to 2,088 B-47’s was recorded during the 60-day test period. Since each of the two bomb wings stationed at Hunter Field was absent on duty during different parts of the 60-day test period (one of them for 38 days and the other for approximately 11 days), and defendant’s observers missed recording about 10 percent of the actual B-47 flights during the test period, it is reasonable to conclude that, had both wings been engaged at the same rate of flight activity at Hunter Field during the entire test *291 period, approximately 4,000 flights of B-47’s would have passed over Highland Park, or at the average rate of over 60 per day. This estimate assumes the fact, not in evidence, that the number of flights at a given time bears a roughly constant ratio to the number of aircraft.
JUST COMPENSATION
22. a. In the years since the close of World War II the area south of the Savannah city limits has expanded in medium-priced residential developments much more rapidly than Savannah’s environs in other directions, due largely to the geographical and environmental obstacles' affecting the latter. Of the many real estate subdivisions opened since 1950 in the southern suburbs of Savannah prices of building lots, measured customarily in terms of dollars per front foot in that area, have increased substantially each succeeding year. Until mortgage money became scarce in the fall of 1956 homesites sold readily in those restricted subdivisions in the southern suburbs which were comparable to the builder’s plans for Highland Park with respect to topography, layout, types of homes, and accessibility to schools, churches, stores and means of transportation.
b. Testimony of plaintiff’s appraisers as to the value of lots in Highland Park, using the market data approach and assuming the absence of jet aircraft flying overhead from nearby Hunter Field, ranged in front-foot dollar values from $20 to $22.50 as of December 31, 1953, from $25 to $27.50 as of April 12,1955, and from $27.50 to $30 as of February 1957.[7] A competent appraiser called by plaintiff made an appraisal for the Veterans Administration in December 1952 of 20 Highland Park lots in the amount of $20 per front foot. Neither of defendant’s two appraisers felt that jet aircraft activity over Highland Park impaired its value for residential purposes. One of them gave an appraised value of the unsold lots as of December 31, 1953, April 12, 1955, and February 1957, in the gross amount of $70,700, computed at $175 each for the 108 lots in the west half and a *292 gross of $36,000 for the 28 lots in the east half, which can be converted roughly into average front foot values of about $2 and $14.84 for the west and east halves, respectively. The other of defendant’s appraisers gave a total appraised value of $70,700 as of December 31, 1953, and April 12, 1955, computed at $175 for each of the 108 lots in the west half and a gross of $51,800 for the 28 lots in the east half, which can be converted roughly into average front foot values of $2 and $21.35 for the west and east halves, respectively. Plaintiff's asking prices (subject to negotiation downward) for the lots in Highland Park averaged $20.21 per front foot in 1952, $20.41 in February 1953, and $24.84 in late 1953. Fragmentary data offered as to specific sales of lots in comparable subdivisions in the area at imprecisely corresponding times indicated front foot prices of $19.40 in 1952, $20 in 1953, and $20 in 1954. From a consideration of the foregoing, of incomplete information on some of the lot sales in Highland Park, and of generalized advice of witnesses active in the real estate field in the Savannah area, the fair market value of the lots in the eastern half of Highland Park was $20 per front foot as of December 31,1953 assuming the absence of jet aircraft activity over the subdivision. By projection of these front-foot figures to the unsold lots in question, the fair market value of the 28 unsold lots in the eastern half of Highland Park, totaling 2,426 front feet, was $48,520.
c. The fair market value of the remaining unsold lots in Highland Park, under the conditions of jet aircraft activity overhead, as of April 12, 1955, and February 1957, was not more than $20,600. This value is entirely speculative, assumes that jet aircraft activity makes the development impossible to market for its highest and best use (i. e., residential homesites), and is based upon the possibility that an investor can be found willing to take a risk on the possibility that events in the future, not now anticipated, may remove the present objections to Highland Park for residential uses and restore the subdivision to a condition of residential desirability comparable to other restricted subdivisions in the southern suburbs of Savannah.
*293 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover. It is therefore adjudged and ordered that plaintiff recover of and from the United States the amount of sixty-five thousand dollars ($65,000.00), plus an amount computed at a rate of four (4) percent per annum from December 31, 1953, to the time of payment, all as just compensation for the taking.
It is further concluded that defendant is vested with a perpetual easement of flight over plaintiff’s property at an elevation of one hundred (100) feet or more above the ground with airplanes of any character.

 The glide angle for the jets wag 100 feet above the ground at the western boundary of plaintiff’s property, rising to 150 feet at the eastern boundary. The glide angle means the lowest permissible flight, consistent with safety.,

 A plat of the property, filed with county authorities, and filed as plaintiff’s exhibit 8 — B, shows this ditch to be 60 feet wide, but, as constructed, it was much narrower.

 The glide angle of the six-engine jets was approximately 100 feet lower than the minimum altitude of which the four-engine propeller-driven planes passed over the property.

 A plat of the property, filed with county authorities, and filed as plaintiff’s exhibit 8-B, shows this ditch to be 60 feet wide, but, as constructed, it was much narrower.

 However, an individual owner of a home in Highland Park resold it in December 1956 under circumstances not disclosed by the record.

 VA Technical Bulletin TB 4A-121 forbade appraisals of property -within a runway zone and gave “special consideration” to property within an approach zone. Twenty of the Southern tier of lots in Highland Park lay just below the lower limits of the east-west runway approach zone, and another 29 lots were only partially included in the approach zone.

 Significance of the three dates; advent of the jets, refusal Of the Veterans Administration to appraise properties at Highland Park for mortgage guarantee purposes, and time of trial, in that order.