Whitaker, Judge,
delivered the opinion of the court:
This is a suit for the taking of an easement of flight over plaintiffs’ property, situated about 4,500 feet from the northwest end of one of the runways at Andrews Air Force Base, about 9 miles southeast of downtown Washington, D.C.
We think plaintiffs’ cause of action, if any, is barred by the statute of limitations.
Plaintiff Carl H. Klein purchased his property in 1939, *209 prior to tbe construction of the Air Base, and resided there until 1956. The Air Force Base was constructed in 1942. There were a number of runways on it, running in various directions, and of varying lengths. Kunway known as 14-32 was originally 5,500 feet long, but in May 1948 it was extended to 6,980 feet. This is its present length. It is much shorter than some of the others and is used only as a subsidiary runway. When it is used, a number of the airplanes using it fly over plaintiffs’ house.
The first military aircraft, which began using the Base in May 1943, were propeller-driven, and this continued until April 1947. At that time, 14 P-80 jet-powered fighters were stationed at the Base, and from then on both propeller-driven and jet planes used the Base, including runway 14-32. Plaintiffs’ use of their property was not seriously interfered with, except by the flights over their property of the jet-powered planes, which made an intense noise and caused much vibration, and which flew at lower altitudes on landing and taking off than the propeller-driven planes.
We think plaintiffs’ cause of action accrued in April 1947, when the 14 P-80 jets were stationed at the Base and began flying over plaintiffs’ property. Highland Park, Inc., v. United States, 142 Ct. Cl. 269; Herring v. United States, 142 Ct. Cl. 695; Adaman Mutual Water Co. v. United States 143 Ct. Cl. 921; Matson v. United States, 145 Ct. Cl. 225. It did not first accrue when the authorities at the Base changed the “aircraft traffic pattern” on August 25,1954, which caused an increased number of aircraft to fly over plaintiffs’ property, nor when activity at the Base greatly increased. It first accrued when defendant for the first time flew one of its jet-powered planes over the property with the intention of continuing to do so at will. Portsmouth Co. v. United States, 260 U.S. 327, 329; Highland Park, Inc. v. United States, supra.
Plaintiffs’ petition will be dismissed.
It is so ordered.
Dukfee, Judge; Lakamoee, Judge; MaddeN, Judge; and Jones, Chief Judge, concur.
*210 FINDINGS OF FACT
The court, baying considered tbe evidence, the briefs and argument of counsel, and the report of Trial Commissioner Saul R. Gamer, makes the following findings of fact:
1. Plaintiffs are and at all times pertinent hereto were husband and wife. They are citizens of the United States and residents of the State of Maryland.
2. In 1939, prior to the building of the installation known as Camp Springs, the predecessor of Andrews Air Force Base, Carl H. Klein acquired the premises known as 41 Marianne Drive, Prince Georges County, Maryland. He was a government employee and purchased the property as a future place to which to retire. Lillian G. Klein, his wife, has a dower interest in the property. The premises consist of 10.3 acres of land and, when acquired in 1939, contained an old building which plaintiffs razed. Plaintiffs then commenced the construction of a dwelling house and used the premises as a summer property, living there during the summer months. However, in 1942, before the house was completed, plaintiffs moved to the property. The house, as well as a garage and storage shed, were fully completed in 1949 and plaintiffs resided there continuously until 1956, except for the period from September 1, 1950, to December 31,1951, when plaintiffs rented out the property.
3. Plaintiffs’ property is located near Suitland Hoad, south of Suitland Parkway near Andrews Air Force Base, and is contiguous to a residential area known as Momingside Village, and particularly the Momingside school. The property is located approximately 9 miles southeast of downtown Washington, D.C. It is rectangular in shape and is virtually surrounded on two sides, i.e., those abutting the areas to the southeast, the south, the southwest, and the west, by other houses, buildings and improvements. The property contains a large wooded area with a stream running through a portion of it. The part of the property near the dwelling house and incidental outbuildings is cleared. The property is zoned as “Rural Residential” and the zoning restrictions prevent the use of the property for other than residential purposes.
*211 4. The dwelling house is a six-room, asbestos shingle, two-story building. The garage is metal and the storage shed is frame. In 1939, when plaintiffs purchased the property, they paid $1,000 for the 10.3 acres. By the time plaintiffs completed the house and other buildings in 1949, the total cost thereof, including utilities, amounted to approximately $14,500. Accordingly, the land and buildings represented a total investment by plaintiffs of approximately $15,500.
5. Andrews Air Force Base (formerly Camp Springs) was activated in December 1942. A number of runways have been constructed and used since that time. Bunway 14-32, extending in a northwest-southeast direction, was placed in operation in 1943. As of January 1959, it was still in use. It is a concrete paved runway 150 feet wide and originally was 5,500 feet long.
6. In May 1948, runway 14-32 was extended to an overall length of 6,980 feet. It has never been further extended. The center of plaintiffs’ property is about 4,500 feet northwest of the northwest end of the runway. The elevation of the northwest end of runway 14-32 is 272 feet above sea level and plaintiffs’ property along the center line of the runway, as extended, varies from elevation approximately 250 to 260 feet above sea level. The top of plaintiffs’ house is at elevation 275. As of January 1959, defendant’s plans called for the undertaking of construction work which will result in runway 14-32 being removed and abandoned. Under this program, it will not be operated after September 1959, and no new runway will permit flights in the same general direction of runway 14-32. However, in 1948 when the runway was last extended, it was not contemplated that it would ultimately be abandoned.
7. At the end of the runway there is a clear zone which is planned in accordance with Air Force regulations. This zone is an area 1,500 feet wide and 1,000 feet long. It begins at the end of the concrete pavement which also is the end of the runway. At the end of the clear zone, the approach zone commences. This zone is an imaginary fan-shaped area starting at the end of the clear zone 1,500 feet wide and fanning out to approximately 4,000 feet in width. It extends outward from the end of the clear zone for a total of *212 10,000 feet. Plaintiffs’ property, being only about 4,600 feet from the northwest end of runway 14-32, is located entirely within the approach zone, as is a large part of Morningside. The extended center line of the runway passes directly over the lower part of the property but not over the house, most of the property being to the right of such center line.
8. The first military aircraft, which were P-47 propeller-driven fighters, arrived at the Base in May 1943. Thereafter, various fighter groups were activated and stationed at the Base for permanent assignment. By December 1943, there were 799 propeller-driven aircraft stationed at the Base. During 1944 there were 950 propeller-driven aircraft at the Base. As of December 1945, there were 161; as of J anuary 1946, there were 102; and in July 1946, there were 60. In J anuary 1947, there were 117 and in March 1947, there were 142 propeller-driven aircraft.
9. In April 1947, 14 P-80 jet-powered fighters were assigned to and stationed at the Base. Thereafter the number of propeller-driven aircraft and the number of jet-powered aircraft of various types, including P-80, F-80, F-82, T-33, KF-80, F-84, F-86, F-94, F-102 and B-57, stationed at the Base, increased and diminished month by month. The following tabulation sets forth the approximate number of jets and conventional planes stationed at the Base, on a monthly average basis, and the approximate number of takeoffs and landings, also on a monthly average basis, for the years 1947-1957 (the 1947 figures commencing with April, when the first jets arrived) :

*213 10. The use of a particular runway for takeoff or landing is determined primarily by wind conditions. On an overall basis, approximately 40 percent of the landings and takeoffs at the Base were, up to January 1949, made to or from runway 14-32. At certain times, such as when the main runway was closed for repairs, all of the traffic at the Base was diverted to runway 14 — 32. In addition, activity varies at the Base. In active periods, and when 14 — 32 was the runway in use, planes would sometimes fly over plaintiffs’ property in droves and fairly continuously throughout the day. On the other hand, there would be extended lulls, since runway 14-32 was not the principal runway at the Base, and was used only when wind conditions so necessitated.
11. (a) Prior to 1954, both jets and conventional aircraft taking off from the northwest end of runway 14^32 frequently flew over plaintiffs’ premises. The flight patterns permitted the flights to take their courses anywhere within the limits of the approach zone. This zone is considerably wider than plaintiffs’ premises, and some planes would not pass over the property at all. For the most part, however, since plaintiffs’ property is in the direct line of the extended center line of the runway and only around 4,500 feet from the end of the runway, the planes did fly over some part of the 10.3 acres comprising plaintiffs’ property, on occasion passing directly over the house or the small part of the cleared area surrounding the house, but at most times flying over other parts of the acreage. When the planes, especially the jets, passed directly over or within approximately 350 feet of the house, they created intense noise, vibration, and discomfort. However, when they passed over parts of the property more distant from the house, the noise at the house location was naturally less severe. At the distance from the end of the runway where plaintiffs’ property is, the planes would normally fly at approximately 350 feet above the ground when crossing the property. However, various factors, such as pilot technique, wind, and temperature, cause variations in this level. For instance, in the summer jets require a longer run, which results in a more shallow climb, so that they would be at a lower altitude over plaintiffs’ property than in the winter. As a result, the planes would *214 sometimes fly over plaintiffs’ property as low as approximately 75 feet.
The flight patterns for landing on runway 14-32 did not call for the planes to cross plaintiffs’ property at all. Occasionally, however, planes landing on the runway would cross the property at elevations ranging from 300-900 feet. The same situation with respect to landings existed after 1954.
(b) Plaintiffs were aware of aircraft from the Base flying over their property at low altitudes from 1943, when runway 14-32 was first placed in operation, and knew that jet aircraft commenced operations in April 1947. Plaintiffs were uncomfortable about and bothered by the flights over their property ever since 1943. Plowever, not all the flights were directly over or close to the house, most being over other portions of the acreage, and plaintiffs found themselves able to tolerate the noise and continue to live on the premises, despite their fear of crashes from the low flying planes. For one thing, during the war years they felt they would necessarily be obliged to put up with the noise and discomforts incident to the country’s war effort. However, after the war years, plaintiffs still continued to reside on the premises, despite the noise and discomfort due to the increased flight activities at the Base, including the jets, plaintiffs finding that it was still possible for them to tolerate the situation.
12. Morningside is, as is plaintiffs’ property, in the direct line of runway 14-32, and the residents thereof made increasing complaints about the noise caused by the planes. In May 1954, due to construction work on the primary runway, all air traffic was temporarily shifted to runway 1N32, and an increase in noise complaints caused by low flying aircraft over the vicinity of Morningside resulted. In an effort to improve community relations, the Base then instituted a noise abatement program. Meetings with local civic groups were arranged as well as personal visits to the homes of complainants. Many studies were instituted in an effort to establish methods of easing the situation. On August 25, 1954, the Base Commander issued an order or regulation, effective September 1,1954, which changed the traffic pattern for planes taking off on runway 14-32. The order required an *215 immediate turn to the right after takeoff. The order was designed to have the planes miss the residential areas of Morningside as well as the Morningside school, which are to the west, north, and south of plaintiffs’ property, the right turn taking the planes to the east. The order, headed “Change of Aircraft Traffic Pattern” stated in part:
Upon taking off from runway 32, all aircraft will make a right turn after passing the airdrome boundary or as soon as safe maneuvering speed is obtained. Every effort will be made by pilots to remain clear of the Morn-ingside housing area.
As part of the program, the pilots were also cautioned about loud and abnormally long takeoffs in order to alleviate further as much noise disturbances as possible.
13. Compliance with the order of August 25, 1954, drastically changed the flight pattern over plaintiffs’ property of the planes taking off on runway 14-32. Theretofore, as set forth in finding 11(a), planes passing over the property did not fly in any set or fixed pattern in relation to the property. Instead, those planes crossing the property flew all over the 10.3 acres, sometimes directly over or very near the dwelling house itself, and sometimes over other portions of the property, frequently crossing only a small comer. Generally, planes passing over the property would fly over the southwest corner, since that was the part of the acreage which was in the direct path of the extended center line of the runway, and then on over Morningside. Plaintiffs’ dwelling house, as well as most of their property, was to the right, or east and north, of such southwest corner. However, after September 1,1954, the execution of the right turn brought most of the planes, especially the jets, directly over the dwelling house and the cleared area adjacent thereto at heights for the most part ranging from approximately 75 to 350 feet. The execution of the right turn would normally result in the planes’ coming into the property at the southwest comer, passing over the entire length of the property through its center, and emerging at the north corner.
It would sometimes be possible for the planes to gain sufficient altitude so as to execute the right turn before reaching plaintiffs’ property, thereby avoiding the property entirely. *216 This would, be especially true of the conventional planes, and, in the case of the jets, would happen more frequently in the winter. However, most of the time the jets would find it necessary to cross the property in the maimer hereinabove described, and many conventional planes did so also. On most T-83 fighter jet takeoffs, the execution of the right turn would take them directly over the property, and in 1954, that was the type of fighter jet that was primarily being used at the Base.
The intense noise and vibration to the house caused by the planes, especially the fighter jets, flying directly over the house in concentrated fashion resulting from the new flight pattern, greatly increased plaintiffs’ discomfort in residing at this location. It seriously interfered with telephone conversations, as well as ordinary conversations, with radio reception, and with plaintiffs’ rest, comfort, and sleep.
14. Plaintiffs had not theretofore registered any formal complaints with defendant about the considerable noise and discomfort they experienced ever since 1943 as a result of low flying planes over their property. However, with the intensification of the situation after September 1, 1954, resulting from the new flight pattern, they directed frequent complaints and protests to the Base. Representatives of the Base made several visits to plaintiffs’ property in an attempt to work out a solution to plaintiffs’ problem, but were not able to find such a solution. To plaintiffs’ complaints, and to representations made on behalf of plaintiffs, the Base Commander, by letters, responded in part as follows:
Letter dated August 29,1956:
* * * the traffic pattern for runway 32 has been changed from left to right so as to avoid the Village of Morning-side, and all traffic using the main runway 1-19 is routed east of the airfield over sparsely populated areas.
Although runway 1-19 is used approximately 80 percent of the time, wind conditions and construction projects often dictate that runway 14-32 be used. Aircraft departing via runway 32 must execute an immediate right turn to avoid the Morningside school and heavy populated areas. Mr. Klein’s property lies directly in the. path of these aircraft as do several other buildings which also cannot be avoided.
*217 Taxiway construction projects required the closing of runway 1-19 during a three-week period which began 13 July. Runway repair has again made it necessary to close runway 1-19 during the entire month of August. These closings account for the fact that Mr. Klein has noticed at times a drastic change in the frequency of flights over his residence.
Mr. Klein may be assured that officials of Andrews Air Force Base will continue to do all that is possible to alleviate this problem consistent with the mission of the Base.
Letter dated September 11,1956:
*****
Unfortunately, Mr. Klein’s residence is located just north of runway 14-32 at Andrews. Aircraft departing runway 32 execute an immediate right turn to avoid the heavily populated village of Morningside and the Morningside School. Although this track routes the aircraft over Mr. Klein’s property, it is actually through the least populated area available for northwest departures.
Runway 32 is used only when wind conditions dictate or when our primary runway (1-19) is undergoing repairs. Such was the case on several occasions during the months of July and August of this year.
Members of my staff have discussed this problem with Mr. Klein and we will continue to devote every effort toward relieving this unfortunate situation.
Letter dated April 15,1957:
‡ ‡ *
c. The traffic pattern for runway 32 has been changed from left to right so as to avoid the heavily populated village of Morningside, Maryland.
*****
Approximately eighty percent (80%) of the Andrews air traffic utilizes runway 1-19. However, wind conditions and construction projects dictates, on occasion, that runway 14r-32 be used. Aircraft departing on runway 32 are required to execute an immediate right turn to avoid the heavily populated area of Morningside, Maryland. Unfortunately Mr. Klein’s property lies directly in the path of these aircraft, and surveys have failed to develop a completely satisfactory solution to Mr. Klein’s problem.
With the runway system that exists at this base, no action can be taken to alleviate the discomfort of Mr. *218 Klein without transferring the problem to the heavily populated village of Morningside, Maryland.
Letter dated May 13, 1957:
* * * it was explained to Mr. Klein, that the present runway system at this base precludes action from being taken which will positively prevent any aircraft from flying over his property unless departures from Runway 32 are routed directly over the village of Morningside.
It is hoped that future military construction programs can provide a refined runway configuration, the implementation of which would enable the routing of traffic to avoid the Klein property. Regrettably I am unable to predict such a future action and therefore cannot offer a satisfactory solution to Mr. Klein’s problem at this time.
Letter dated August 8, 1957:
*****
The situation with respect to Runway 32 at this installation remains unchanged. Prevailing northwest winds, airfield repair projects and emergency situations continue to dictate that this runway be utilized for approximately thirty percent of our total aircraft traffic.
Based upon my present mission and my current knowledge of the construction program for this base, I can see no relief in the near future for Mr. Klein.
15. In addition to the discomfort caused by the new flight pattern, the entire situation was further aggravated by the increased flight activity at the Base, as is indicated by the annually increasing number of takeoffs and landings shown in the chart set forth in finding 9. On one day, July 25, 1956, over 200 planes, some jets and some conventional, flew over or very near to plaintiffs’ house in a period of time from around 8 a.m. to 7:30 p.m. Plaintiffs felt also that the new flight pattern causing the planes to fly so frequently directly over their house made it exceedingly dangerous for them to live there. Finally, plaintiffs could endure the situation no longer, and abandoned the property as a residence in September 1956. As of January 1959, it had not been lived upon since plaintiffs moved therefrom.
16. When plaintiffs decided to move from the property in 1956, they attempted to sell the entire 10.3 acres and the build *219 ings thereon, but they have not been able to do so at a price which they consider to be commensurate with its value or their investment. In 1956, plaintiffs sought to obtain $23,000 for the property and buildings, but received no offers at that figure. By 1957, plaintiffs lowered their price to $20,000, but were still unable to effectuate a sale. An offer of $11,000 was received in December 1957 for the house and 2 acres, but plaintiffs rejected it. Despite listings of the property with local real estate agents, and efforts of plaintiffs themselves, the property was, as of January 1959, still unsold. The property is capable of being subdivided into homebuilding lots by a developer.
17. (a) Plaintiffs contend that the new flight pattern commencing September 1, 1954, pursuant to the “right turn” regulation of August 25, 1954, resulting in the concentrated flying of planes directly over and very close to their house, and across their property, constituted a taking of their entire premises for which they are entitled to just compensation for its value as of August 1954.
For its use as residential property, which was the only use to which these premises could be put, the fair market value of plaintiffs’ premises in August 1954, considering the nature of the aircraft activity then prevailing over the premises, was $24,820, calculated as follows:
10.3 aeres @ $1,400 per acre_$14,420
Buildings_ 10,400
24,820
At this time, the airplane activity over plaintiffs’ property had depreciated its fair market value by 20 percent. Had there been no such activity, the fair market value of the property would therefore have been $31,025, calculated as follows:
10.3 acres @ $1,750 per acre_$18,025
Buildings_ 13,000
31,025
Thus, as of August 1954, the plane activity had depreciated the fair market value of the property by the amount of $6,205.
On and after September 1, 1954, the intensified plane activity over the dwelling house, and the course of the flight *220 pattern over the property, as above described, resulted in a further depreciation in the fair market value of plaintiffs’ property by an additional 25 percent, such value falling therefore to $18,615, calculated as follows:
10.3acres @ $1,050 per acre_$10,815
Buildings_ 7, 800
18, 615
Thus, after September 1, 1954, the new pattern of plane activity further depreciated the fair market value of the property by the amount of $6,205, and the total depreciation from the $31,025 fair market value of the property if there had been no plane activity at all was $12,410.
(b) In April 1952 (6 years prior to the filing of the petition herein on April 11,1958), the fair market value of the property, considering the nature of the aircraft activity then prevailing over the premises, was $20,700, calculated as follows:
10.3acres @ $1,000 per acre_$10,300
Buildings_ 10,400
20,700
At this time, the airplane activity over plaintiffs’ property had similarly depreciated its fair market value by 20 percent. Had there been no such activity, the fair market value of the property would therefore have been $25,875, calculated as follows:
10.3acres @ $1,250 per acre_$12, 875
Buildings_ 13,000
25, 875
(c) In 1956, when plaintiffs abandoned the property as their residence, the fair market value of the property, considering the nature of the aircraft activity then prevailing over the premises pursuant to the “right turn” order of August 25,1954, and the increased flight activity at the Base, continued to be $18,615, calculated as set forth above. Had there been no plane activity over the property, the property would at that time have had a fair market value of $36,175, calculated as follows:
*221 10.3 acres @ $2,250 per acre_$23,175
Buildings_'_ 13,000
36,175
Thus, as of 1956, the plane activity had depreciated the fair market value of the property by the amount of $17,560.
CONCLUSION 0E LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and their petition is dismissed.